UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 08 CR 50009 |
| | ) | |
| DOUGLAS HILL, | ) | Hon. Frederick J. Kapala |
| Defendant. | ) | |

**DEFENDANT DOUGLAS HILL'S SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE**

Now comes Defendant **DOUGLAS HILL**, by and through his attorney **PATRICK E. BOYLE**, and respectfully submits the following Supplemental Memorandum in Support of Motion to Suppress Evidence as follows:

In its written response asking this Court to deny Defendant Douglas Hill's Motion to Suppress Evidence, the Government made several essential factual allegations and arguments. Now that this Court has held a full evidentiary hearing on the issues and has heard sworn testimony from the arresting and searching officers, this Court can now better evaluate the Government's claims.

Did the Police Response Corroborate the Anonymous 911 Caller's Claims of a Shooting?

An essential allegation by the Government was that prior to the police's arrest and search of Mr. Hill "[a]ll of the information available to the police indicated that they were dealing with an armed man who had shot at his girlfriend and was now attempting to avoid arrest." (Government's Response at P.7) In fact, the officers' testimony at the hearing demonstrated just the opposite – that the allegation of a shooting was directly contradicted by all of the available evidence. The only "information" that suggested that Mr. Hill had shot at his girlfriend was the

allegation made by the anonymous 911 caller in her 2:39 a.m. call.  The officers testified that they responded to their dispatcher who informed them that this 911 caller claimed that she was in the area of the Family Dollar store. (Transcript at p. 54) Officer Eric Pearson, who was one of the first officers to arrive at the Family Dollar location, testified that the officers checked the area and did not find anyone who could have been the 911 caller or a possible perpetrator.  (Tr. at p. 56) Further, Officer Pearson was asked:

> Q. As part of your canvas of the immediate area of the Family Dollar, did you see any evidence that supported the claim that there had just been a shooting there?
>
> A. No.  (Tr. at p. 56)

Officer Pearson also testified that they never received any additional information from their dispatcher, such as additional 911 calls from witnesses, confirming that a shooting had taken place.  Officer Pearson testified that other officers arrived at the scene, searched the area around the Family Dollar, and they were also unable to find any evidence of a shooting.  (Tr. at pg. 56-7)

One of those other officers was Dominick Barcellona who also testified at the hearing. Officer Barcellona testified that when he arrived at the Family Dollar scene his fellow officers had already done a canvas of the area and concluded that the area was "clear."  Officer Barcellona confirmed that the scene was a very quiet, placid residential scene at that point.  (Tr. at p. 44) Officer Barcellona was asked:

> Q. But was there anything, based upon your observation and your fellow officers' observation, that would lead an experienced, intelligent officer to think that a violent chase or a shooting had just taken place in this area?
>
> A. Right at the Family Dollar? No.  (Tr. at p. 45)

Officer Barcellona also testified that the officers did not find any evidence of a shooing such as

witnesses or spent shell casings. (Tr. at p. 42-44) In its redirect of Officer Barcellona the Government established that not every gun discharges spent shell casings when fired and therefore their absence does not absolutely rule out a shooting. (Tr. at P. 46) Of course this is true, but a violent chase and shooting down a residential street is not a subtle event. The vast majority of guns, whether or not they discharge shell casings, make an extremely loud report when fired. Such loud reports should have been heard by someone, whether a police officer on patrol, or one of the residents of the numerous houses in this residential area. Again, most significantly, the officers immediate response to and investigation of the anonymous 911 caller's claims, revealed absolutely no corroboration of the claim of a shooting or even the presence of the 911 caller, and instead should have raised serious questions regarding the 911 caller's credibility.

     The Government obviously recognized the fact that the officers' investigation of the 911 call and their canvas of the Family Dollar area should have cast serious doubt on the 911 caller's credibility. That is why the Government attempted to radically limit the officers' testimony to only their actions at Mr. Hill's residence and to argue that testimony regarding their investigations of the Family Dollar area was "beyond the scope" of the Motion. (Tr. at P. 52) The Government knew that the evidence concerning the police's response to and investigation of the 911 call would directly contradict their claim that "[a]ll of the information available to the police indicated that they were dealing with an armed man who had shot at his girlfriend and was now attempting to avoid arrest." (Government's Response at P. 7) Instead, all of the "information" that the police gathered as part of their investigation of the 911 call provided no evidence of a shooting or any corroboration of the anonymous caller's claims of a shooting. Further, despite the officers' testimony that their "investigation continued" there was never

anything discovered that supported the claim that a shooting took place in the area of 4201 Kennett, Rockford, Illinois on January 12, 2008 and the Government knows that. Consequently, the situation here is remarkably similar to the one described by the unanimous Supreme Court in Florida v. J.L., 592 U.S. 266 (2000). The Court recognized the danger of a false, anonymous 911 caller and specifically addressed this problem in a case such as Mr. Hill's and rejected a firearm exception to the established reliability analysis: "Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." Id. At 272.

Did Mr. Hill Attempt to Avoid Arrest?

      The second part of the Government's assertion, namely that the police were dealing with someone who "was now attempting to avoid arrest," is also curious. (Government's Response at P. 7) What was the evidence that Mr. Hill was ever "attempting to avoid arrest?" The testimony at the hearing was that Mr. Hill was inside his residence in the early morning hours when his home was surrounded by six police officers. (Tr. at p. 24-25) The officers' testimony was clear that they did everything they could to prevent whomever was in the 4201 Kennett residence from learning of their presence or office. The officers testified that they did not use lights or sirens when proceeding to the 4201 Kennett location. (Tr. at p. 23) The officers did not park their squads in front of the residence, instead they parked on another street 300 feet away from Mr. Hill's home. (Tr. at p. 58) The officers then surrounded the house. (Tr. at p.24) Instead of announcing their presence and office to whomever was in the home, the officers did everything they could to obscure their presence. Officer Barcellona testified that he and his partner actually set up their position behind a privacy fence in Mr. Hill's backyard thereby guaranteeing that they

could not be observed or identified as police officers. (Tr. at p. 24) Officer Pearson testified that he did approach the front of the house and went close to the front door but he never knocked or announced his office. (Tr. at p. 66) Instead of knocking, Officer Pearson testified that he just listened outside the door for about a minute and heard no evidence of an argument or disturbance inside the residence. (Tr. at p. 66-67) The testimony was then that Mr. Hill opened his garage door and walked out onto his driveway. He then immediately complied to the officers' demand that he get face-down on his driveway. This is the only action taken by Mr. Hill that was observed by the officers and testified to. Consequently, where is the evidence that supports the Government's claim that Mr. Hill "was now attempting to avoid arrest?"

Based on the Government's Response and its direct of Officer Barcellona it can be anticipated that the Government will make much of the fact that two dogs were let out of the backdoor of Mr. Hill's residence. Officer Barcellona testified that at some point he observed two pit bull dogs in the backyard. (Tr. at P. 8) Officer Barcellona was not sure how the dogs had got into the backyard but he testified that he heard a "male voice" say "Let's get the boys." (Tr. at P.7) In its Response, the government asserts that with this command, Mr. Hill "ordered them to attack" the police officers. (Government's Response at P.6) The command of "Let's get the boys" is completely ambiguous at best if not incoherent. What must be remembered is that the dogs were let out into an enclosed backyard. The only police in the back were behind the privacy fence. When the dogs were let out there was no evidence that the homeowner had any idea that police were even at his property and the officers testified that they had done everything they could to obscure their presence and office. Officer Barcellona testified that the dogs never left their enclosed backyard, never attacked the officers, and the officers did not shoot or even

ever restrain the dogs. (Tr. at 27) The dogs were just left in the backyard throughout the entire incident until they were eventually secured by animal control. (Tr. at p. 27) Most tellingly, Officer Pearson testified that he never even mentioned the dogs in his arrest report. (Tr. at p. 66) Consequently, the Government's attempt to turn the most mundane of actions – the act of a dog owner letting his dogs out into his enclosed backyard – into something sinister fails completely.

<u>Was the Arrest of Mr. Hill Pursuant to an Emergency Response?</u>

In an attempt to distinguish the facts of Mr. Hill's case from the controlling decision of <u>Florida v. J.L.</u>, the Government asserted that the arrest of Mr. Hill was pursuant to an emergency response. At the evidentiary hearing, the Government attempted to dramatically shorten the time-line of the police response to the 911 call and dispatch. In its direct of Officer Barcellona, the Government suggested that the 911 call and dispatch went out at 2:47 a.m. (Tr. at p. 3 & 4). However, pre-trial discovery and the testimony of Officer Barcellona confirmed that the dispatch response to the 911 call actually went out at 2:39 a.m. (Tr. at p. 21) Officer Barcellona testified that he did not respond until 2:47 and by that time his fellow officers had already canvassed the area around the Family Dollar and found it to be clear. There is no dispute that the police had an obligation to take the dispatch seriously and the first response to the Family Dollar location was an emergency response. However, this response and investigation revealed that the police were likely dealing with a less than credible 911 caller. Their investigation revealed that she was not where she claimed to be and that there was absolutely no corroboration of a chase and shooting. Recognizing this, the police ended their emergency response and instead turned their investigation into something quite different.

In it's questioning of Officer Pearson, the Government elicited testimony that Officer

Pearson had prior information that Mr. Hill was a "known narcotics dealer." (Tr. at p.51) While the Defendant disputed the relevance of this testimony since there was no evidence that the subject on the driveway was identified as Mr. Hill prior to his arrest and search, this was actually very revealing testimony. The officers testified that after establishing that the Family Dollar area was clear they did not then rush to the 4201 Kennett address, but instead relocated to a different location to formulate a tactical plan. The tactical plan they agreed upon was not an emergency response, but rather what most closely resembles a classic search warrant raid of a drug house. Of course, here there was no search or arrest warrant or probable cause. Officer Barcellona testified that before proceeding to the 4201 Kennett address he took time to load his assault rifle. He also testified that he did not use their lights or sirens because "I wasn't driving in an emergency fashion . . . " (Tr. at p. 23) The officers then did not park immediately at the front of the house, but instead parked on another street 300 feet away from the house. Consequently, the officers then had to take the time to walk the 300 feet to the house. Even after getting to the house the officers did not immediately make their presence known and knock on the front door. Instead the officers set up a perimeter, several taking up completely obscured positions, and just waited. It was not until Mr. Hill walked out of his house that the officers even revealed their presence. Consequently, there is no way that the officers actions at 4201 Kennett and their 3:11 a.m. arrest of Mr. Hill can be characterized as pursuant to an emergency response. (Tr. at p. 22)

<u>Was the Arrest and Search of Mr. Hill a Terry Stop?</u>

Another essential assertion by the Government is that the officers arrest and search of Mr. Hill was merely a <u>Terry</u> stop and not a full custodial arrest. However, the officers' testimony concerning their contact with Mr. Hill on his property clearly establishes that he was

subject to an arrest and search and not a Terry stop.  The evidence also established that the arrest and search of Mr. Hill was not supported probable cause or even the reasonable suspicion that would justify a mere Terry stop.

The Fourth Amendment protects "against unreasonable searches and seizures."  U.S. Constitutional Amend. IV.  In Terry v. Ohio, the Supreme Court noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  Thus, under Terry, a police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity is afoot.  Id., at 21-22, 88 S.Ct. 1868.  Reasonable suspicion has been defined as "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed. 621 (1981).  While reasonable suspicion requires something less than what is necessary to show probable cause, it requires more than a mere "hunch."  United States v. Tipton, 3 f.3d 1119, 1122 (7th Cir. 1993); United States v. Quinn, 83 F.3d 917, 921 (7th Cir. 1996).

Courts consider the totality of circumstances when assessing the reasonableness of a police search or seizure, including the methods they employ.  See, Green v. Butler, 420 F.3d 689, 694-95 (7th Cir. 2005) Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted.  Bell v. Wolfish, 441 U.S. 520, 559, S.Ct. 1861, 60 L.Ed.2d 447 (1979).  As the Supreme Court

stated in <u>Florida v. Royer</u>, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983):

> The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however is clear . . . the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis or reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. 460 U.S. at 500.

To qualify as a lawful <u>Terry</u> stop, a detention must be limited in scope and executed through the least intrusive means. <u>United States v. Novak</u>, 870 F.2d 1345, 1352 (7th Cir. 1989) A seizure becomes an arrest when "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." <u>United States v. Ienco</u>, 182 F.3d 517, 523 (7th Cir. 1999) (citing <u>United States v. Bengivenga</u>, 845 F.2d 593, 596 (5th Cir. 1988)

  Here, the arresting and searching officers testified as to their contact with Mr. Hill. After investigating and canvassing the area around the Family Dollar and finding no corroboration of the anonymous 911 caller's claims they then decided to go to the County Highway Department and formulate a plan of investigating the residence at 4201 Kennett Avenue. (Tr. at 57) Despite the fact that they were unable to locate the 911 caller or corroborate her claims of a shooting the officers decided not to communicate with their dispatcher or ask for additional information. The Government mocked any suggestion that the investigating officers could have contacted their dispatcher or called themselves for additional information concerning the 911 caller or the occupants of the 4201 Kennett Avenue as "dialing for dollars." (Tr. at p. 39) Would the Government similarly mock a patrolman's decision to have his dispatcher run a license plate before approaching a vehicle? Does it not make sense for the police to use the available

9

technology to help in their investigation, especially here where their investigation had revealed that they could be dealing with an untrustworthy crank 911 caller? While Officer Barcellona suggested that there was "no time" to make such inquiries, it must be noted that he had time to load his semiautomatic assault rifle prior to walking the 300 feet to Mr. Hill's home. (Tr. at p. 25 & 19) Consequently, prior to surrounding Mr. Hill's home they had no confirmation that Mr. Hill even lived there.

      The officers testified that they surrounded the property. The Government's Exhibit 1 established that Mr. Hill's property was in a residential neighborhood and that he had a large yard that had to be traversed by the officers to get to his home. Despite seeing nothing unusual about the house or hearing any disturbance the officers choose to go on Mr. Hill's property. But instead of simply knocking on the front door to inquire and determine if everything was as calm as it appeared, the officers, all armed, just waited. Mr. Hill then opened his garage door and walked out onto his driveway. At this point, the officers had not announced their presence or office. Officer Pearson testified that when he first saw Mr. Hill he had a hand in his pocket. (P. 49) Of course, it being a cold January day there is nothing unusual about someone having their hand in their pocket. There was no testimony that Mr. Hill ever made any threatening movements or gestures at the police. Officer Pearson testified that when he saw Mr. Hill (who was not identified as being Mr. Hill prior to the search) he was just standing still on his driveway. (Tr. at p. 60) Officer Pearson testified that Mr. Hill did not shout or say anything to the officers. (Tr. at p. 60) The first thing said was Officer Pearson's order for Mr. Hill "to show him his hands" which Mr. Hill did. Then Officer Pearson ordered Mr. Hill to the ground and Mr. Hill immediately complied, ending up face down on his driveway. (Tr. at P. 50)

Officer Barcellona testified that he ran across Mr. Hill's property and went onto his driveway with his assault rifle trained on Mr. Hill. (Tr. at p. 30) He saw Mr. Hill comply with the command to get down and saw him end up face down on his driveway. (Tr. at p. 30) Officer Barcellona testified that all six officers then approached Mr. Hill, surrounding him in a two to three foot circle. (Tr. at P.31) The first physical contact from the police to Mr. Hill was Officer Pearson taking hold of Mr. Hills arms and handcuffing them behind his back. (Tr. at p. 31) Officer Pearson then immediately went into Mr. Hill's coat pocket and produced a handgun. (Tr. at p. 33) While the Government has attempting to characterize Officers Pearson's search as a "frisk" or "pat-down" both Officers Barcellona and Pearson acknowledged that they described Officer Pearson's actions as a "search" and never used the words "frisk" or "pat-down" in their arrest reports. (Tr. at p. 33 and 63) The distinction between a search and a pat-down is important and not just a question of semantics. The testifying officers are both very experienced and they clearly know the difference between a search – which is what they described in their reports – and a simple frisk or pat-down. The officers wrote nothing in their reports about Officer Pearson patting down or frisking Mr. Hill prior to the search of the pocket. While there is no bright line separating a <u>Terry</u> stop and a full custodial arrest, Mr. Hill believes that the facts here establish that his search went beyond a mere <u>Terry</u> stop, and was a full arrest and search that needed to be justified by probable cause. Most significantly, the arrest and search of Mr. Hill took place on his own property, was done while he was surrounded by six armed officers (with at least one officer training an assault rifle at him) while Mr. Hill was handcuffed face-down on his driveway. Finally, the search was not a frisk but instead an immediate and intrusive search into Mr. Hill's pockets. Consequently, the officers failed to use the least intrusive means possible

and the arrest and search was not supported by probable cause or even reasonable suspicion.

Consequently, the Defendant Douglas Hill respectfully asks this Court to apply the facts of his case to the relevant law, specifically the Supreme Court's holding in <u>Florida v. J.L.</u>, to consider all of the arguments made by Mr. Hill here and in his original Motion and supporting Memorandum, and grant his Motion to Suppress.

                Respectfully submitted,

                **DOUGLAS HILL**

By:   <u>s/ Patrick E. Boyle</u>
        By his attorney Patrick E. Boyle

Law Offices of Patrick E. Boyle
**PATRICK E. BOYLE**
155 N. Michigan Ave., Suite 562
Chicago, IL 60601
(312) 565-2888

**CERTIFICATE OF SERVICE**

      The undersigned Attorney certifies that the following Supplemental Memorandum in Support of Motion to Suppress was served on **Monday, August 11 30, 2008**, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                              By:    s/ Patrick E. Boyle
                                                          PATRICK E. BOYLE

Law Offices of Patrick E. Boyle
**PATRICK E. BOYLE**
155 N. Michigan Ave., Suite 562
Chicago, IL 60601
(312) 565-2888