# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Frederick J. Kapala | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 08 CR 50009 | **DATE** | 8/22/2008 |
| **CASE TITLE** | United States v. Douglas Hill | | |

**DOCKET ENTRY TEXT:**

Defendant's motion to suppress evidence [13] is denied.

■ [ For further details see text below.]      Docketing to mail notices.

## STATEMENT

    Defendant Douglas Hill is charged by indictment with possessing a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Defendant has filed a motion to suppress evidence contending that Winnebago County Sheriff's Deputies unlawfully seized him premised on information from an "anonymous" 911 caller. Defendant maintains that the subsequent seizure of the firearm from his coat pocket and the statements he made thereafter were the fruit of the tainted seizure. At the evidentiary hearing on defendant's motion, the government presented the testimony of Winnebago County Sheriff's Deputies Dominick Barcellona and Eric Pearson.

### I. FINDINGS OF FACT

    Deputy Barcellona testified that on January 12, 2008, at approximately 2:47 a.m., he and Officer Mike Peterson were informed by radio dispatch that a female had called and said that her boyfriend, Douglas Hill, was shooting at her while chasing her down the street. She described Hill as a 39-year-old black male. Dispatch also informed the deputies that the female caller said that she was fleeing from 4201 Kennett Avenue and was currently at the Family Dollar Store on Springfield Avenue. It took Barcellona and Peterson several minutes to travel to the area in their marked squad car. When they arrived in the area several other units already had arrived and had checked the vicinity of the Family Dollar Store and located no one. Barcellona and Peterson met with Deputies Woodford and Pearson at the nearby Winnebago County Highway Department where they decided to check the welfare of the occupants at 4201 Kennett Avenue.

    According to Barcellona, the Deputies parked their squad cars down the street from 4201 Kennett Avenue. Barcellona and Peterson approached the house and went to the northwest part of the property.[1] Peterson informed Barcellona that he saw a silhouette of a man looking out of a window of the house. Barcellona heard a male voice say "Let's get the boys" before two pit bulls began barking in the backyard behind a wooden privacy fence. Barcellona heard the garage door opening and informed the other deputies by radio. Next, Barcellona heard one of the deputies yell "police" and give commands to someone to get down on the ground. When Barcellona turned around, he saw a black male in the process of going down to his knees. Barcellona drew his weapon and pointed it at the man. Pearson handcuffed the man, patted him down for weapons, and recovered

**STATEMENT**

a handgun from the man's right front pocket. Barcellona identified the man with the handgun as defendant.

Barcellona testified further that the 911 call from the female came in at 2:39 a.m. and that the telephone number of the caller was on the dispatch ticket. Barcellona responded at 2:47 a.m. and arrived with Peterson in the area of the Family Dollar Store at 2:51 a.m. Barcellona believed that someone asked defendant to identify himself before he was searched. Barcellona acknowledged that there were no other 911 calls reporting gunshots in the area that morning.

Pearson testified that in response to the same dispatch, he walked around the area of the Family Dollar Store and also checked an adjacent subdivision without locating anyone. After meeting the other deputies at the Winnebago County Highway Department, Pearson proceeded to 4201 Kennett Avenue. As Pearson approached the house, Deputy Barcellona informed him over the radio that there was a person coming out of the garage. Pearson ran to the garage and saw defendant emerging from the garage looking around the corner toward Deputies Barcellona and Peterson with his hand in his coat pocket. Pearson announced "Sheriff's Police. Let me see your hands," and ordered defendant to the ground. Defendant complied. At that time, Pearson handcuffed defendant and patted him down for weapons before removing a black handgun in defendant's right front coat pocket. Pearson said that prior to the morning of January 12, 2008, he had information that Doug Hill was a known narcotics dealer.

## II. ANALYSIS

The first issue presented to the court is the nature of the seizure of defendant at the time the handgun was discovered on defendant's person. If the seizure was a full custodial arrest, as defendant maintains, then probable cause was required. If, on the other hand, it was an investigative stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968), then only reasonable articulable suspicion of criminal activity was required. Defendant argues that the seizure of his person was a full custodial arrest and thus the deputies needed, and lacked, probable cause. Defendant's argument is based on the fact that the deputies seized him with drawn weapons and immediately handcuffed him. The Seventh Circuit has found, however, that a Terry stop is not converted into a full custodial arrest just because police officers draw their weapons or use handcuffs, provided such use is reasonably necessary to assure the officers' or bystanders' safety. United States v. Shoals, 478 F.3d 850, 853 (7th Cir. 2007); United States v. Tilmon, 19 F.3d 1221, 1226-28 (7th Cir. 1994) (holding that "[t]he mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety"). In this case, the use of drawn weapons and handcuffs to detain defendant was warranted considering the threat defendant presented to the deputies based on the 911 report that he had just shot at his girlfriend while chasing her down the street and considering that he had his right hand in his coat pocket when he emerged from the garage. Thus, the court finds that the weapon was discovered on defendant's person during an investigative Terry stop that had not yet evolved into a full custodial arrest. Consequently, the deputies were justified in seizing defendant if they had reasonable articulable suspicion that criminal activity was afoot.

Defendant argues this case is controlled by Florida v. J.L., 529 U.S. 266 (2000), and that the motion to suppress must be granted because the anonymous tip did not exhibit "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Id. at 270. In J.L., the Supreme Court considered whether an anonymous, unrecorded caller's tip that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" was, without more, sufficiently reliable to lawfully initiate a Terry stop. Id. at 268. The Court held that it was not. Id. at 271. The Court reasoned that the anonymous tip lacked sufficient indicia of reliability because, inter alia, it: (1) "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility;" and (2) did not explain "how [the caller] knew about the gun nor supplied any basis for believing he had inside information on J.L." Id.

In this case, defendant argues that because the responding deputies found nothing in the area to

corroborate the anonymous 911 caller's report, that is, they found no caller near the Family Dollar Store, no shell casings laying about, and received no other reports of gunshots, the anonymous 911 call could not support a Terry stop under J.L. Defendant does not argue that the information provided by the 911 caller, if reliable, was not sufficient to give rise to a reasonable suspicion, only that such information was unreliable under J.L. The government's response is two-fold: (1) J.L. is not controlling because the caller was not "anonymous" because she provided enough identifying information to allow them to eventually learn her name and conduct a follow up interview with her, and (2) in any event, this case is distinguishable from J.L. because the caller reported a life-threatening on going emergency.

The Seventh Circuit has recently reiterated that J.L. is inapplicable where the tipster gives her name or other identifying information. United States v. Hicks, 531 F.3d 555, 229 (7th Cir. 2008). "Reasonable suspicion may be based on a telephone tip when the caller provided enough information to allow police to identify her and track her down later to hold her accountable if her tip proved false." Id. (quotation marks omitted). In this case, the 911 caller gave the authorities enough information about herself to allow them to identify her and track her down later to hold her accountable if her tip proved false. She gave them defendant's name, her relationship with defendant, and the address where they both had been before her 911 call. See United States v. Brown, 496 F.3d 1070, 1075-76 (10th Cir. 2007) ("An unnamed individual who divulges enough distinguishing characteristics to limit his possible identity to only a handful of people may be nameless, but he is capable of being identified and thus is not anonymous. For example, if a tipster says 'I wish to be anonymous, but I live at the apartment building on a certain street corner' or 'I wish to remain anonymous, but I have a blue truck and work at the Burger King on a particular avenue,' the person may have provided sufficient clues for an intrepid officer to find and identify him.") In addition, the deputies had the telephone number of the telephone the caller used to make the 911 call. See J.L., 529 U.S. at 276 (Kennedy, J. concurring) (concluding that where a caller can be identified by his phone number the reliability of the tip increases). Moreover, reports of crime contemporaneously visited upon the caller are entitled to more reliability. See United States v. Terry-Crespo, 356 F.3d 1170, 1176 (9th Cir. 2004). Therefore, the court concludes that the 911 caller was not anonymous in the same sense as the caller in J.L., and reasonable suspicion for detaining defendant could be premised on the information received from the 911 caller.

This case is also distinguishable from J.L. because the 911caller's report was of an on going emergency. In Hicks the Seventh Circuit recognized that "[e]very circuit to consider the question, including [the Seventh Circuit] has distinguished J.L. when the tip is not one of general criminality, but of an ongoing emergency." Hicks, 531 F.3d at 558-59. The Court in Hicks characterized the rule "as rooted in the special reliability inherent in reports of ongoing emergencies." Defendant does not take issue with the characterization of the 911 call as an emergency. Instead, defendant suggests that the emergency was not ongoing because the deputies found no evidence of the reported crime upon arriving in the area.

The 911 call came in at 2:39 a.m. Deputies Barcellona and Peterson arrived in the vicinity of the Dollar Store 12 minutes later at 2:51 a.m. By then, Deputy Pearson had checked the area without locating the caller. Defendant contends that when the deputies found no evidence to corroborate the 911 caller's report they should have realized that they were likely dealing with a less than credible 911 caller. While that was certainly one reasonable inference that could be drawn at that point, it was also an entirely reasonable inference that the emergency situation was ongoing and that in the 12 minutes that had elapsed since the 911 call, defendant had caught up with the caller and had taken her back to 4201 Kennett Avenue at gun point. To justify a Terry stop, the officer must indicate specific and articulable facts taken together with rational inferences to warrant the intrusion. Terry, 392 U.S. at 21. A Terry analysis requires that due weight be given to "the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." Id. at 27. The whole picture must be taken into account in determining whether the police are justified in conducting a Terry stop, including the inferences and deductions made by a trained police officer. United States v. Cortez, 449 U.S. 411,

**STATEMENT**

417-18 (1981). Thus, irrespective of the possibility that the 911 caller was not telling the truth, the inference that the emergency was potentially ongoing was rational. Therefore, the court finds that J.L. is distinguishable based on the report of an on going emergency.

  Finally, defendant advances the argument that Deputy Pearson exceeded the permissible scope of the Terry detention when he immediately retrieved the handgun from defendant's coat pocket. Defendant maintains that, contrary to the evidence, the government has characterized Pearson's immediate reach into defendant's pocket as a frisk for weapons. Deputies Barcellona and Pearson each testified that Pearson patted defendant down for weapons before reaching into his coat and removing the firearm. The court credits this testimony and is not convinced it should disbelieve it just because Peterson's report generically indicates that Pearson searched defendant without specifying the type of search performed.

### III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress evidence is denied.

---

1. Barcellona indicated that a total of six officers approached the house but, in addition to himself, only mentioned Peterson, Pearson, and Woodruff by name.